UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICARDO BENITEZ, | **COMPLAINT** |
| Plaintiff, | 17 Civ. 03827 |
| -against- | |
| RAUL LOPEZ, FRANK LIBRETTO, SERGEANT STAMM, AND TINA GRILLO, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff RICARDO BENITEZ ("Plaintiff" or "Benitez"), by his attorneys, the LAW OFFICES OF JOEL B. RUDIN, P.C. respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1. This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary damages for Plaintiff, RICARDO BENITEZ, due to his malicious prosecution and unlawful conviction for robbery, and his nearly six-year imprisonment, all of which was caused by the misconduct of New York City Police Department ("NYPD") officers RAUL LOPEZ, FRANK LIBRETTO, and SERGEANT STAMM, and of TINA GRILLO, an employee of the Queens County District Attorney's Office ("QCDAO") acting in an investigative capacity on behalf of the City of New York.

2. Plaintiff was arrested and prosecuted in 2009, and convicted at trial, for an armed robbery that he did not commit. Plaintiff, a 54-year-old parolee who walked with a cane and was in a rehabilitation center at the time of the offense, is a far cry from the young man described by the robbery witnesses as "running away" from the scene. Yet Plaintiff was an easy target for investigators eager to "close" a difficult case with no other suspects. They did so by manufacturing, through unlawfully suggestive procedures, obviously unreliable and false "identification" evidence, which then became the sole basis to arrest, prosecute, and convict Plaintiff.

3. Plaintiff's conviction ultimately was reversed, and he was acquitted after a second trial, but not before he spent almost six years behind bars.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

4. This action arises under 42 U.S.C. §§ 1983 and 1988.

5. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by the principles of pendent jurisdiction.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7. This action has been commenced within the applicable time period for each claim.

8. Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

9. Plaintiff, RICARDO BENITEZ, is a citizen and resident of the State of New York and of the United States, and resides within the Eastern District of New York.

10. Defendant, RAUL LOPEZ ("LOPEZ"), was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

11. Defendant, FRANK LIBRETTO ("LIBRETTO"), was at all relevant times an officer employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

12. Defendant, SERGEANT FNU STAMM ("STAMM"), was at all relevant times a sergeant employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

13. Defendant, TINA GRILLO ("GRILLO"), was at all relevant times a prosecutor employed by the Queens County District Attorney's Office and the City of New York, acting within the scope of her authority as a criminal investigator and under color of State law. She is named here in her individual capacity.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**The Radio Shack Robbery and Initial Investigation**

14. On June 24, 2009, at approximately 11 a.m., a Radio Shack store at 87-09 Rockaway Beach Boulevard, in Rockaway Park, Queens (hereinafter referred to as "Radio Shack"), was robbed of approximately $400 (hereinafter "the Radio Shack robbery").

15. Two Radio Shack employees, Bernadette Johnson and Hazel Rodriguez, were present at the time of the crime, and both called 911.

16. Members of the New York City Police Department responded to their call and arrived at the Radio Shack. These NYPD members interviewed Johnson and Rodriguez and learned the following information:

   a. There was a single perpetrator;

   b. The perpetrator was armed with a handgun;

   c. The perpetrator was wearing sunglasses, dark pants and a hooded sweatshirt;

   d. The perpetrator was between 5'6"-5'8" tall;

   e. The perpetrator had a goatee;

   f. The perpetrator appeared to be a light-skinned, African-American or Hispanic male;

   g. The perpetrator was in his 20s or 30s; and

   h. After the robbery, the perpetrator *ran* out of the store.

17. The robbery also was recorded on the Radio Shack's store surveillance system. The video showed the perpetrator of the robbery as:

   a. Moving about the store with no visible limp;

   b. Wearing a hooded sweatshirt with the hood pulled up; and

   c. Being present in the store for less than five minutes.

18. Based on Johnson's and Rodriguez's information, the NYPD officers conducted an investigation that day in the area around the Radio Shack location.

19. As part of this investigation, the officers questioned people concerning whether they had seen anyone running away from the store in the manner described by Johnson and Rodriguez.

20. No arrest was made on June 24, 2009, in connection with the robbery.

21. On June 24, 2009, the witnesses Johnson and Rodriguez viewed photographs at the 100th Precinct with an NYPD officer.

22. Despite looking at numerous photographs, they did not select anyone.

23. On June 26, 2009, the witness Johnson was shown additional photographs at the 100th precinct. Again, Johnson did not select anyone as the perpetrator.

24. The officers, contrary to NYPD practice and procedure and legal requirements, failed to maintain a record of the photographs viewed by the witnesses, including whether the Plaintiff's photo was among them, and failed to make a record of any comments made by the eyewitnesses when they viewed the photos.

**Ricardo Benitez's Whereabouts on June 24, 2009**

25. On June 24, 2009, at 11 a.m., when the robbery was committed, PLAINTIFF RICARDO BENITEZ, 54 years old and a parolee, was at a rehabilitation center, located at 108-30 Sutphin Boulevard, in Queens.

26. This rehabilitation center is nearly 10 miles away from the location of the Radio Shack robbery.

27. A month earlier, in May, Plaintiff had been diagnosed with necrosis of the right hip. As a result, from that time through the time of the Radio Shack robbery and beyond, Plaintiff almost always walked with a cane.

28. From May 2009 through the time of the Radio Shack robbery and beyond, Plaintiff walked with a visible limp.

29. He lived with his mother, who was dying, spent much of his time tending to her, and was being careful to comply with the conditions of his parole.

**The Continued Police Investigation into the Radio Shack Robbery**

30. Defendant RAUL LOPEZ was assigned by the NYPD to investigate the Radio Shack robbery about a week after it occurred.

31. At the time Defendant LOPEZ was assigned, there were no known suspects in the robbery.

32. Defendant LOPEZ, assisted by an NYPD Sergeant, Defendant STAMM, conducted a database search to look for all parolees in the 100th precinct in an effort to find a suspect in the robbery.

33. Plaintiff's name and address appeared.

34. Plaintiff's address was across the street from the Radio Shack.

35. On July 3, 2009, Defendants LOPEZ and STAMM contacted the witness Johnson to arrange for her to view a photo array containing Plaintiff's photograph from the parolee database.

36. NYPD procedures require that photo arrays be prepared in a non-suggestive manner so that no individual – especially the suspect – stands out. The physical features of the fillers are required to match those of the suspect as closely as possible.

37. In the photo array prepared by Defendants LOPEZ and STAMM, Plaintiff's photograph obviously stood out and thus suggested to the eyewitness whom to select.

38. His photograph was the only one in which the person depicted:

      a. Was wearing a hooded sweatshirt (like the description of the Radio Shack robber);

      b. Had a goatee (like the description of the Radio Shack robber);

      c. Was unshaven;

      d. Had closely cropped hair; and

      e. Was noticeably thin.

39. The witness Johnson selected Plaintiff's photograph as the perpetrator.

40. Defendant LOPEZ also showed witness Hazel Rodriguez the photo array with Plaintiff on July 3, 2009. She said she did not see the perpetrator's face clearly and did not identify Plaintiff (or anyone else).

**Plaintiff's Arrest**

41. Later on July 3, 2009, after Johnson's photo identification of Plaintiff, Defendant LOPEZ, along with Defendant STAMM, went to Plaintiff's apartment building.

42. Defendants LOPEZ and STAMM were aware at the time they went to Plaintiff's apartment of the descriptions given by Rodriguez and Johnson of the perpetrator of a much younger man who *ran* out of the store.

43. At the building, Defendant LOPEZ interviewed a neighbor of Plaintiff's who said that he (the neighbor) saw Plaintiff earlier that morning. The neighbor specifically mentioned that he saw Plaintiff walking with a cane.

44. Defendants LOPEZ and STAMM saw Plaintiff outside Plaintiff's apartment building. Plaintiff was walking with a cane, was limping, and was much older than the individual described by the eyewitnesses.

45. Upon seeing Plaintiff, Defendants LOPEZ and STAMM, assisted by two other NYPD officers, took Plaintiff's cane away and put Plaintiff in handcuffs.

46. Defendants LOPEZ and STAMM knew when they arrested Plaintiff that he could not have been the Radio Shack robbery perpetrator because he was much older and appeared physically incapable of running out of and away from the store in the manner described by the eyewitnesses. Nevertheless, they arrested him.

47. Knowing he had not committed the robbery, Plaintiff voluntarily consented to a search of his apartment by Defendants LOPEZ and STAMM.

48. They found no evidence of the robbery – no gun, no money, and none of the clothing or the sunglasses described by the eyewitnesses or appearing in the store video – in Plaintiff's apartment.

49. Nevertheless, Defendants LOPEZ and STAMM continued Plaintiff's arrest and detention, and transported him to the 100th Precinct in Rockaway, Queens.

**The Line Up, Formal Charges and Indictment of Plaintiff**

50. After his arrest, Plaintiff was taken to the 100th precinct.

51. He was placed in a lineup arranged by Defendants LOPEZ and LIBRETTO, and by Assistant District Attorney GRILLO.

52. Defendants LOPEZ and LIBRETTO selected and assembled non-suspect "filler" individuals to stand in the lineup.

53. At the time the lineup was conducted, no decision to prosecute had been made, no criminal complaint had yet been filed with any court, and no grand jury proceeding had been conducted.

54. Defendant GRILLO, as a representative of the D.A.'s office working together with the police in their investigative capacity, supervised the lineup.

55. Defendants LOPEZ, LIBRETTO and GRILLO knew that, according to law and the announced policy of the NYPD, they were required to conduct a fair, non-suggestive lineup composed of a suspect and fillers who resembled the physical appearance of the suspect as closely as possible.

56. Nevertheless, they jointly conducted a lineup in which Plaintiff, as the "suspect", obviously stood out because:

    a. Plaintiff was much older than the fillers by 15-20 years;

    b. He was much darker than the fillers, who were light-skinned;

    c. He was unshaven whereas the fillers were clean cut;

    d. He was noticeably thinner than the fillers; and

    e. He was noticeably sickly looking whereas the fillers looked like the picture of wholesomeness and good health.

57. The defendants who conducted the lineup knew it was a highly suggestive, improper lineup but went forward with it anyway.

58. Despite the suggestiveness of the lineup, the witness Johnson took at least half a minute before she was able to make a decision whether to identify anyone in it.

59. She ultimately selected Plaintiff as the perpetrator of the Radio Shack robbery.

60. Only after this lineup identification occurred, and as a direct result of it, was a decision made to formally charge Plaintiff with the Radio Shack robbery,

61. A sworn Criminal Court complaint charging Plaintiff with first degree robbery and related charges was then signed by Defendant LOPEZ.

62. On July 4, 2009, Plaintiff was arraigned on the charges in the Complaint in the Criminal Court, Queens County.

63. At Plaintiff's arraignment, based upon the lineup identification that the Defendants had manufactured, the prosecution succeeded in convincing the court to set a high bail which Plaintiff was unable to satisfy, resulting in his incarceration through the conclusion of his trial.

64. On or about October 21, 2009, Defendant LOPEZ testified in the grand jury.

65. LOPEZ testified about the identification procedure conducted with Plaintiff, but did not inform the grand jury, and the grand jury did not otherwise learn, any of the following:

   a. That Plaintiff walked with a limp and used a cane, whereas eyewitnesses to the robbery had seen the perpetrator run away;

   b. Plaintiff did not fit the eyewitness description of a perpetrator in his 20s or 30s;

   c. The lineup at which Plaintiff was identified was unduly and impermissibly suggestive as set forth in ¶ 56;

   d. That lineup followed a photo array procedure that also was highly suggestive; and

   e. Plaintiff had consented to the search of his apartment and no contraband from the robbery or clothing worn by the robber had been found.

66. On or about October 21, 2009, the grand jury voted an indictment against Plaintiff, charging him with robbery in the first degree and related charges.

10

67. Based entirely upon Johnson's manufactured identification testimony, Plaintiff was convicted at a jury trial and sentenced on December 14, 2010, to serve 22 years to life in prison.

**The Appeal and Re-trial**

68. On August 20, 2014, the New York State Appellate Division, Second Department, reversed Plaintiff's conviction.

69. Plaintiff was re-tried in Supreme Court, Queens County, and acquitted of all charges on March 11, 2015.

70. Plaintiff was released from custody that day.

71. In total, Plaintiff spent 5 years, 8 months, and 8 days in custody.

## FIRST CAUSE OF ACTION

**(42 U.S.C. § 1983; Malicious Prosecution Under Federal Law and Deprivation of Liberty Under the Fourth, Fifth, and Fourteenth Amendments; All Individual Defendants)**

72. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 71 of this Complaint.

73. The Individual Defendants, acting in concert with each other, initiated, continued, or caused the initiation or continuation of, criminal proceedings against Plaintiff.

74. The criminal proceedings terminated in Plaintiff's favor.

75. There was no probable cause for the commencement or the continuation of the criminal proceedings.

76. The Individual Defendants acted with actual malice.

77. By virtue of the foregoing, the Individual Defendants are liable under 42 U.S.C. § 1983, for compensatory and punitive damages, for knowingly, willfully, and maliciously causing Plaintiff to be prosecuted, without probable cause, and to be deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; the Individual Defendants)**

78. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 77 of this Complaint.

79. As set forth above, the Individual Defendants, acting separately and in concert, deliberately manufactured identification "evidence" against Plaintiff which they knew was false or, at the very least, unreliable.

80. The Individual Defendants forwarded, or caused to be forwarded, this false evidence to the prosecutor.

81. They did so knowing the false evidence they had manufactured was likely to be relied upon by a jury at trial.

82. By manufacturing in bad faith the only "evidence" in the case that implicated Plaintiff in the robbery, the Defendants caused Plaintiff to be arrested, prosecuted, held in lieu of bail, indicted, convicted, and imprisoned for a total of nearly six years.

83. The Individual Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

## **DAMAGES DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

(a) For compensatory damages of not less than $7.5 million;

(b) For punitive damages of not less than $7.5 million;

(c) For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

(d) For pre-judgment interest as allowed by law; and

(e) For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN

          /s/
_____
By:   JOEL B. RUDIN
      TERRI S. ROSENBLATT
      HARAN TAE
Law Offices of Joel B. Rudin, P.C.
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 752-7600

*ATTORNEYS FOR THE PLAINTIFF*

Dated:  New York, New York
        June 26, 2017