UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RICARDO BENITEZ,

                    Plaintiff,

     -against-

THE CITY OF NEW YORK, RAUL LOPEZ,
FRANK LIBRETTO, SERGEANT BRIAN
STAMM, AND TINA GRILLO,

                  Defendants.

**AMENDED COMPLAINT**

17 Civ. 03827 (SJ)(SJB)

**JURY TRIAL DEMANDED**

Plaintiff RICARDO BENITEZ ("Plaintiff" or "Benitez"), by his attorneys, the LAW

OFFICES OF JOEL B. RUDIN, P.C., respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff, RICARDO BENITEZ, arising from his malicious prosecution and

unconstitutionally-obtained conviction for robbery, and his nearly six-year imprisonment.

Plaintiff's ordeal was caused by the misconduct of New York City Police Department ("NYPD")

officers RAUL LOPEZ, FRANK LIBRETTO, and SERGEANT BRIAN STAMM, and of TINA

GRILLO, an employee of the Queens County District Attorney's Office ("QDAO") acting in an

investigative capacity on behalf of the City of New York, as well as by the unconstitutional

policies of THE CITY OF NEW YORK ("the City"), administered by the QDAO.

2.      This lawsuit seeks to hold the Individual Defendants liable for fabricating and

withholding evidence, and for causing the initiation of Plaintiff's malicious prosecution.  It

further seeks to hold the City liable for the unlawful customs, policies and practices of the

1

Queens District Attorney, a New York City policymaking official, which caused Plaintiff to be wrongfully convicted at trial. The above parties are liable under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v. Dept. Of Social Services*, 436 U.S. 658 (1978).

3.      Plaintiff was arrested and prosecuted in 2009 for an armed robbery that he did not commit. Plaintiff, at arrest, was a 54-year-old parolee suffering from a degenerative hip disease and COPD who couldn't possibly have been the perpetrator described by the robbery witnesses as a young man they saw "running away" from the scene. But as a parolee living near the scene of the crime, Plaintiff was an easy target for investigators eager to "close" a difficult case with no other suspects. They did so by manufacturing false "identification" and other evidence, which they then used to arrest Plaintiff and to bring about his prosecution. Employees of the QDAO then finished the job, bringing about a conviction by presenting, and failing to correct, what they knew to be false testimony, while withholding exculpatory evidence from the defense. They were caused to do this by an office policy that was indifferent to misconduct and rewarded prosecutors for "winning" cases.

4.      Plaintiff's conviction ultimately was reversed, and he was acquitted after a second trial, but not before he spent almost six years behind bars.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by the principles of pendent jurisdiction.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.      This action has been commenced within the applicable time period for each claim.

2

9.      Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.      Plaintiff, RICARDO BENITEZ, is a citizen and resident of the State of New York and of the United States, and resides within the Eastern District of New York.

11.      Defendant, RAUL LOPEZ ("LOPEZ"), was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

12.      Defendant, FRANK LIBRETTO ("LIBRETTO"), was at all relevant times an officer employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual capacity.

13.      Defendant, SERGEANT BRIAN STAMM ("STAMM"), was at all relevant times a sergeant employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual capacity.

14.      Defendant, TINA GRILLO ("GRILLO"), was at all relevant times an attorney employed by the QDAO and the City of New York, acting within the scope of her authority as a criminal investigator and under color of State law.  She is named here in her individual capacity.

15.      Defendant THE CITY OF NEW YORK, of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.  The QDAO is an agency of the City.  The District Attorney ("D.A."), assistants district attorney ("ADAs"), and detective-investigators ("D.I.s") employed by the QDAO are agents and employees of Defendant CITY, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Radio Shack Robbery and Initial Investigation

16.     On June 24, 2009, at approximately 11 a.m., a Radio Shack store at 87-09 Rockaway Beach Boulevard, in Rockaway Park, Queens (hereinafter referred to as "Radio Shack"), was robbed of approximately $400 (hereinafter "the Radio Shack robbery").

17.     Two Radio Shack employees, Bernadette Johnson and Hazel Rodriguez, were present at the time of the crime and witnessed it.

18.     Johnson and Rodriguez reported the following information to the police:

     a.     There was a single perpetrator, armed with a handgun;

     b.     The perpetrator was wearing sunglasses, dark pants, and a hooded sweatshirt;

     c.     The perpetrator was between 5'6"-5'8" tall;

     d.     The perpetrator had a goatee;

     e.     The perpetrator appeared to be a light-skinned, African-American or Hispanic male;

     f.     The perpetrator was in his 20s or 30s; and

     g.     After the robbery, the perpetrator *ran* out of and away from the store.

19.     The robbery was recorded on the Radio Shack's store surveillance system, which showed the perpetrator:

     a.     Moving about the store with no visible limp;

     b.     Wearing a hooded sweatshirt with the hood pulled up; and

     c.     Interacting with Ms. Johnson for no more than 30 seconds.

20.     Based on Johnson's and Rodriguez's information, the NYPD officers who responded questioned other potential witnesses about, and searched the area for, a man who ran away from the store in the manner described by Johnson and Rodriguez.

21.     No arrest was made on June 24, 2009, for the robbery.

22.     Rather, on that date, Johnson and Rodriguez viewed photographs at the 100th Precinct with an NYPD officer, but did not identify anyone.

23.     On June 26, 2009, Johnson was shown additional photographs at the 100th precinct, but again did not select anyone.

**Ricardo Benitez's Whereabouts on June 24, 2009**

24.     When the Radio Shack robbery was committed, Plaintiff, RICARDO BENITEZ, was present at a rehabilitation center, located at 108-30 Sutphin Boulevard, in Queens.

25.     Plaintiff was 54 years old and was a parolee known to the NYPD.

26.     He was living across the street from the Radio Shack.

27.     The rehabilitation center is nearly 10 miles away from the location of the Radio Shack robbery.

28.     A month earlier, in May 2009, Plaintiff had been diagnosed with necrosis of the right hip and told he would need surgery.

29.     Plaintiff almost always walked with a cane, was unable to run, and walked with a pronounced limp.

30.     He lived with his mother, who was dying, spent much of his time tending to her, and was being careful to comply with the conditions of his parole.

**The Continued Police Investigation into the Radio Shack Robbery**

31.     Defendant RAUL LOPEZ was assigned by the NYPD to investigate the Radio Shack robbery about a week after it occurred.

32.     At the time Defendant LOPEZ was assigned, there were no known suspects in the robbery.

33.     Defendant LOPEZ learned, at the time he was assigned, the description of the perpetrator previously provided by Johnson and Rodriguez and contained in the surveillance video.

34.     Defendant LOPEZ, together with an NYPD Sergeant, Defendant BRIAN STAMM, conducted a database search to look for parolees in the 100th precinct who might have been responsible for the robbery.

35.     Plaintiff's name and address close to the scene of the crime appeared.

36.     On July 3, 2009, Defendants LOPEZ and STAMM contacted the witness Johnson to arrange for her to view a photo array containing Plaintiff's photograph, which they had obtained from the parolee database.

37.     NYPD procedures require that photo arrays be prepared in a non-suggestive manner so that no individual – especially the suspect – stands out.  The physical features of the fillers are required to match those of the suspect as closely as possible.

38.     Rather than follow proper procedure, Defendants LOPEZ and STAMM deliberately designed a photo array that would unlawfully suggest to the witness that Plaintiff was the perpetrator and result in his false identification.

39.     They did so in the following ways:

    a.     Knowing that Johnson had seen the perpetrator wearing a hooded sweatshirt and a goatee, they used a photograph of Plaintiff wearing a hooded sweatshirt and a goatee, while including no other photograph showing a man wearing a sweatshirt or a goatee;

    b.     Making Plaintiff further stand out as the only man who was unshaven and the only man who had closely-cropped hair; and

    c.     Using a photograph of Plaintiff looking gaunt and sickly, but no other similar photograph.

40.     Just as they had intended, Johnson falsely identified Plaintiff from his photograph as the perpetrator.

41.     After Johnson made her false identification of Plaintiff, Defendant LOPEZ created a police "follow up" report, known as a "DD5," that purported to contain a summary of a confidential tip received by the "Crime Stoppers" tip line.

42.     In this DD5, Defendant LOPEZ falsely alleged that a "tipster" with personal knowledge of the crime had reported to the police that the Radio Shack robbery was committed:

    a.     By a person named "Rick";

    b.     Who lived at building "82-01" on an unnamed street; and

    c.     Whose apartment was on the sixth floor of that building, to the left of the elevator bank.

43.     Defendant LOPEZ created this false DD5 for the purpose of forwarding it to the prosecution to bolster what he knew was a weak case based on an obviously suggestive photo identification.

**Plaintiff's Arrest**

44.     On July 3, 2009, Defendants LOPEZ and STAMM went to Plaintiff's apartment building looking to arrest him based upon the false identification evidence they had manufactured.

45.     They knew that Rodriguez and Johnson had described a man in his 20s or 30s who *ran* out of the store.

46.     While at the building, LOPEZ interviewed a neighbor of Plaintiff's who said that he (the neighbor) saw Plaintiff earlier that morning, *walking with a cane.*

47.     LOPEZ and STAMM later saw Plaintiff outside of his apartment building. Plaintiff had a cane, was limping, and was much older than the individual described by the eyewitnesses.

48.     Upon seeing Plaintiff, Defendants LOPEZ and STAMM discarded Plaintiff's cane and handcuffed him.

49.     Following their arrest of Plaintiff, Defendants LOPEZ and STAMM learned that, in addition to using a cane and walking with a limp, Plaintiff had a degenerative and arthritic hip and suffered from the breathing disorders COPD and asthma.

50.     Based upon Plaintiff's age and physical condition, Defendants LOPEZ and STAMM knew he could not be the Radio Shack robber described by the eyewitnesses.

51.     Also pointing to Plaintiff's innocence was his consent to search his apartment, which resulted in Defendants LOPEZ and STAMM finding nothing related to the robbery:   no gun, no money, and none of the clothing or the sunglasses described by the eyewitnesses or appearing in the store video.

52.     In addition, the second eyewitness, Hazel Rodriguez, did not identify his photo.

53.     Nevertheless, Defendants LOPEZ and STAMM continued to detain Plaintiff and held him in custody at the 100th Precinct in Rockaway, Queens.

**The Line Up, Formal Charges and Indictment of Plaintiff**

54.     At the 100th precinct, Defendants LOPEZ and LIBRETTO, knowing Plaintiff did not fit the eyewitnesses' descriptions and was innocent, placed him in a lineup anyway.  They did so in a manner that was designed to assure he would be falsely identified.

55.     Defendants LOPEZ and LIBRETTO selected and assembled "filler" individuals to stand alongside Plaintiff in the lineup.

56.     At the time the lineup was conducted, no decision to prosecute had been made, no criminal complaint had yet been filed with any court, and no grand jury proceeding had been conducted.

57.     Defendant GRILLO was present in an investigative capacity on behalf of the QDAO to supervise the lineup.

58.     Defendants LOPEZ, LIBRETTO and GRILLO knew that, under the Constitutions of the State of New York and the United States, as well as the announced policy of the NYPD, they were required to conduct a fair, non-suggestive lineup composed of a suspect and fillers who resembled the physical appearance of the suspect as closely as possible.

59.     Instead of following such procedures, Defendants LOPEZ, LIBRETTO and GRILLO conducted a lineup that maximized the likelihood that Plaintiff would be selected by having him stand out in the following ways:

a.      Plaintiff was the only person in the lineup whose photograph had been displayed to Johnson in the photo array;

      b.     Plaintiff, who was in his 50s, appeared to be 15 to 20 years older than the fillers;

      c.     With the perpetrator having been described as black or Hispanic, Plaintiff appeared much darker than the fillers, who were light-skinned;

      d.     Plaintiff was unshaven and looked disheveled, whereas the fillers were clean-cut policemen;

      e.     Plaintiff was noticeably thinner than the fillers; and

      f.     Plaintiff looked sickly, whereas the fillers looked in good health.

60.     After viewing this lineup, Johnson selected Plaintiff as the perpetrator.

61.     The Individual Defendants informed intake or screening prosecutors at the QDAO of the "identification," knowing this would cause Plaintiff to be prosecuted, and in fact it did cause such a prosecution to be approved.

62.     A sworn Criminal Court complaint charging Plaintiff with first degree robbery and related charges was then drawn up by the QDAO, based upon the identification, and executed, under oath, by Defendant LOPEZ.  This document, when filed in court, formally initiated Plaintiff's criminal prosecution.

63.     The prosecutor or prosecutors who approved Plaintiff's prosecution were unaware of the discrepancy between Plaintiff's physical condition, age, and appearance and that of the actual perpetrator of the robbery, as well as the manner in which the false identification "evidence" against Plaintiff had been manufactured.

64.     On July 4, 2009, Plaintiff was arraigned on the charges in the Complaint in the Criminal Court, Queens County.

65.     At Plaintiff's arraignment, based upon the lineup identification that the Individual Defendants had manufactured and their withholding from the prosecution of their knowledge that Plaintiff was not the perpetrator of the crime, the court set a high bail which Plaintiff could not make, and he was incarcerated.  He remained in jail through the conclusion of his trial.

66.     On or about October 21, 2009, Defendant LOPEZ testified in the grand jury and, through his fraud, perjury, suppression of evidence and other conduct undertaken in bad faith, caused Plaintiff to be wrongfully charged with a crime LOPEZ knew Plaintiff did not commit.

67.     Specifically, LOPEZ, knowing that Bernadette Johnson had identified Plaintiff as the man she had seen commit the robbery and then run away, withheld from the Grand Jury his knowledge that:

      a.     Plaintiff walked with a limp, used a cane, had degenerative hip disease and arthritis, and suffered from asthma and COPD, and thus could not have been the person Johnson saw;

      b.     Plaintiff did not fit the eyewitnesses' description of a perpetrator in his 20s or 30s;

      c.     Johnson's identification of Plaintiff had resulted from extraordinarily suggestive photo and corporeal procedures that were designed to and did elicit false identifications; and

      d.     Plaintiff had consented to the search of his apartment and no contraband from the robbery or clothing worn by the robber had been found.

68.     On or about October 21, 2009, the grand jury voted an indictment against Plaintiff, charging him with robbery in the first degree and related charges.

**The Trial Proceedings**

69.     Plaintiff's jury trial commenced on October 13, 2010, before Justice John B. Latella in Queens County.

70.     During the trial, Johnson (but no other witness) identified Plaintiff as the perpetrator.  There was no other evidence that linked Plaintiff to the crime.

71.     Plaintiff was convicted of all charges against him on October 19, 2010.

72.     Plaintiff was sentenced to 22 years to life in prison, and was sent upstate to serve his sentence.

73.     On August 20, 2014, Plaintiff's conviction was reversed on appeal by the Appellate Division, Second Judicial Department.

74.     Plaintiff remained in custody following the reversal of his conviction pending his retrial.

75.     Plaintiff was acquitted at his retrial and released from custody on or about March 11, 2015.

76.     In total, Plaintiff spent five years, eight months, and eight days in custody.

## FIRST CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial
Under the Fifth, Sixth, and Fourteenth Amendments; the
Individual Defendants)**

77.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 76 of this Complaint.

78.     As set forth above, the Individual Defendants, acting separately and in concert, knowingly, willfully, deliberately and/or recklessly manufactured false photo array and line up

identification evidence for the purpose of creating a basis to bring criminal charges against Plaintiff that otherwise didn't exist.

79.     The Individual Defendants forwarded, or caused to be forwarded, this false evidence to the D.A.'s Office, knowing it was likely to influence that Office to bring criminal charges against Plaintiff and that it was likely to influence a jury at trial to convict.

80.     Defendant LOPEZ also manufactured the false DD5 concerning the "tip" information, and caused the DD5 to be forwarded to the D.A.'s Office, knowing such false evidence was likely to influence a jury at trial to convict.

81.     The evidence in fact was a substantial cause of the D.A.'s decision to initiate and continue Plaintiff's criminal prosecution, and resulted in Plaintiff's loss of liberty and other consequential damages.[1]

82.     The Individual Defendants are liable, pursuant to 42 U.S.C. § 1983, for the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and for all resultant damages.

### SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983; Malicious Prosecution Under Federal Law and Deprivation of Liberty Under the Fourth, Fifth, and Fourteenth Amendments; All Individual Defendants)**

83.     Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 82 of this Complaint.

---

[1] Evidence need not be admitted, *or admissible*, at trial to be "likely to influence a jury." *See Nnodimele v. Derienzo,* No. 13CV3461ARRRLM, 2016 WL 337751, at *12 (E.D.N.Y. Jan. 27, 2016) (discussing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)).

84.     The Individual Defendants, acting in concert with each other, knowingly, willfully, and deliberately initiated, continued, or caused the initiation or continuation of, criminal proceedings against Plaintiff, and his loss of liberty.

85.     The criminal proceedings terminated in Plaintiff's favor.

86.     There was no probable cause for the commencement or the continuation of the criminal proceedings, and the Individual Defendants knew this.

87.     The Individual Defendants acted with actual malice.

88.     By virtue of the foregoing, the Individual Defendants are liable under 42 U.S.C. § 1983, for the violation of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and for all resultant damages.

## THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983/*Monell*; Claim Against Defendant City of New York for Actions of the Queens County District Attorney's Office)

89.     Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 88 of this Complaint.

90.     On or about June 14, 2010, at a pretrial calendar call, the assigned prosecutor from the QDAO conceded that the lineup was too improperly suggestive to be offered into evidence at trial.  However, the prosecutor argued that the witness Johnson, based upon her original observation of Plaintiff at the time of the commission of the crime, had an "independent source" for her identification of Plaintiff in court.

91.     On or about August 9, 2010, a pretrial hearing was held in Supreme Court, Queens County, before Justice Joseph Grosso, concerning whether the court would permit Johnson to identify Plaintiff at trial based upon "independent source."

14

92.     During the preparation for this hearing, the prosecutor learned that at the time of the lineup, ADA GRILLO had accused LOPEZ of selecting inappropriate fillers and conducting an improperly suggestive lineup, that GRILLO had requested LOPEZ to select more suitable fillers, that LOPEZ had refused, and that LOPEZ and GRILLO had gone ahead with the lineup anyway.

93.     The fact that GRILLO, a prosecutor, accused LOPEZ, a detective, of acting improperly at the most critical point in the investigation of the case, that LOPEZ had refused to comply with her request to make the lineup fairer, and that they had proceeded with the lineup anyway, was favorable to the Plaintiff at his criminal trial because, among other things, it would have made Detective LOPEZ appear less credible to the jury and would have caused the jury to question the integrity and the reliability of the police investigation and the prosecution.

94.     The prosecutor had an obligation to disclose to the Plaintiff's criminal defense counsel and to inform the court, under *Brady* and its progeny, that this disagreement had occurred and the lineup and the Detective and the D.A.'s Office had proceeded anyway, but never did so.

95.     Prior to the hearing, the prosecutor also caused Johnson, who had said the perpetrator was in his 20s and ran from the scene of the robbery, to change her testimony to conform to Plaintiff's physical appearance and condition.

96.     Contrary to her prior statements and grand jury testimony, Johnson testified at the hearing, for the first time, that the perpetrator was in his 50s, had sunken cheeks, and had brown eyes – testimony that the prosecutor had helped Johnson contrive to match Plaintiff's appearance.

97.     In addition, the prosecutor, through improper, leading questioning, caused Johnson to testify that she had observed the perpetrator limping – something she had never told police or said in her grand jury testimony.

98.     At no time during the independent source hearing, or later at the trial, did the prosecution reveal the manner in which the prosecutor had caused Johnson to change her testimony.

99.     During the hearing, the prosecution also elicited false testimony from Johnson which it failed to correct: that she had directly observed the perpetrator for five minutes, and that the entire incident took 30 minutes. In fact, as a surveillance videotape showed, the perpetrator was in the store for less than five minutes, and Johnson's personal interaction with him took no more than 30 seconds.

100.     In denying Plaintiff's motion to suppress Johnson's in-court identification of Plaintiff, the court relied on Johnson's false testimony concerning the length of her observation and the appearance and behavior of the perpetrator.

101.     Meanwhile, the court was not presented with, and did not consider, the potential impact of the suggestive photo array procedure on Johnson's "independent" ability to make an uncorrupted, in-court identification.

102.     In addition, the court was unaware that LOPEZ had been accused by ADA GRILLO of conducting an impermissibly suggestive lineup, had refused to change the fillers to make it less suggestive, and that he and GRILLO had gone forward with the improper lineup anyway.

103.     But for the prosecution's improper conduct at the independent source hearing in presenting and failing to correct false testimony by Johnson, the court would have denied the

prosecution's application to permit identification testimony at trial and the case would have been dismissed.

104.    Plaintiff's jury trial commenced on or about October 13, 2010.

105.    LOPEZ, testifying for the prosecution, recounted the false information about the "tip" contained in his DD5.

106.    LOPEZ testified that he received a "tip" that led him to Plaintiff's address, and to search for a person named "Rick" there.

107.    This testimony, consisting of a statement implicating Plaintiff in a crime by a non-testifying, unnamed source, violated Plaintiff's federal constitutional rights to confrontation and a fair trial under the Fifth, Sixth and Fourteenth Amendments.  *See, e.g. Ryan v. Miller*, 303 F.3d 231, 250-51 (2d Cir. 2003) (granting habeas corpus relief where prosecutor introduced implicit accusation of defendant made by non-testifying third party).

108.    The prosecutor was aware that admitting this statement would violate Plaintiff's constitutional rights, but the prosecutor elicited the testimony anyway.

109.    During the prosecutor's summation, he made the following knowingly false or misleading statements to the jury about the alleged tip, which further unduly prejudiced Plaintiff:

    a.    LOPEZ received the "tip" information personally, instead of through a third party;

    b.    The "tipster" provided Plaintiff's full address, instead of merely a street number without a street name;

    c.    The tipster provided Plaintiff's apartment number;

    d.    The person the tipster identified as "Rick" was Ricardo Benitez.

110.     The prosecutor also knowingly violated Plaintiff's Confrontation Clause and Fair Trial rights by telling the jury that it could consider the hearsay information in the "tip" for the truth of the matter asserted: that "Rick" was Plaintiff and he was the robber.

111.     The only other evidence against Plaintiff at trial was in the in-court identification testimony of Johnson.

112.     Because of the prosecution's concealment, the jury did not learn that the prosecution had improperly influenced Johnson to change her testimony to conform to Plaintiff's physical appearance and disability, nor did it learn of the conduct of the detectives and ADA GRILLO in proceeding with a blatantly suggestive lineup procedure that they all knew was unlawful.

113.     The aforementioned conduct of Queens ADAs in knowingly presenting, and failing to correct, false testimony at the independent source hearing and at trial, in failing to disclose information favorable to the defense prior to or during such proceedings, in knowingly eliciting improper hearsay testimony, and in making false and misleading arguments during summation, violated Plaintiff's constitutional rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

114.     The foregoing violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant THE CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens District Attorney's Office, namely:

a.      The institution and implementation by the District Attorney of plainly
inadequate or unlawful policies, procedures, regulations, practices and/or
customs concerning:

     i.      The duty not to create or to otherwise use false, misleading or
unreliable evidence, testimony, statements or argument during
criminal proceedings;

     ii.      The obligation to correct false, inaccurate, incomplete or
misleading evidence, testimony, statements and argument,
whenever such misconduct is discovered to have occurred;

     iii.      The obligation to refrain from introducing at trial evidence that the
prosecutor knows will violate the defendant's constitutional rights
and cause him or her prejudice;

     iv.      The continuing obligation to timely and fully disclose material
favorable to the defense as set forth in *Brady v. Maryland,* 373
U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and
their progeny; and

b.      The District Attorney's deliberate indifference to the need, and his failure,
to adequately instruct, train, supervise, and/or discipline his employees
with respect to such matters.

115.      The aforesaid deliberate or de facto policies, procedures, regulations, practices
and/or customs, including the failure to properly instruct, train, supervise and/or discipline
employees with regard thereto, were implemented or tolerated by policymaking officials for

Defendant CITY, including, but not limited to, the District Attorney of Queens County and his delegates, who knew:

    a.    To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

    c.    That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

    d.    That employees of the QDAO had a history of making wrong choices in such matters.

116.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

    a.    Numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A hereto and incorporated by reference) that Queens County ADAs had:

        i.    Participated in the manufacturing of false testimony or evidence, including identification evidence;

        ii.    Presented or failed to correct false or misleading testimony and argument;

20

      iii.     Failed to disclose information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

      iv.     Made arguments at trial that were so false, misleading, or otherwise improper so as to deprive the defendant of due process and a fair trial; and

   b.     The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

117.    At the time of Plaintiff's trial, the Queens District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to conduct internal disciplinary investigations, or to discipline, the prosecutors who were known to engage in it, including the prosecutors responsible for the misconduct found in the judicial decisions listed in Exhibit A, or to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

118.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions and commendations, based in part on their record of winning at trial and extracting guilty pleas even in weak cases.

119.    Thus, prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning, but would suffer no negative consequence if they won by violating the rights of the defendants they were prosecuting in the unlikely event their misconduct was exposed.

120.    Further encouraging prosecutors to win at any cost was their knowledge that the QDAO had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions.

121.    Indeed, prosecutors were emboldened to violate basic constitutional provisions protecting criminal defendants' constitutional right to a fair trial by their knowledge that the District Attorney was willing to pursue or tolerate policies, customs and practices that brazenly violated criminal defendants' fundamental constitutional rights.  These included a self-styled and blatantly unconstitutional "Chinese Wall" policy, under which impeachment material and information required to be disclosed by the Office under *Brady* was withheld from the trial prosecutors responsible to disclose it, a practice of illegally arresting and often secretly detaining witnesses indefinitely in defiance of a material witness statute that required such witnesses to be brought before a judge "forthwith," and a policy of delaying arraignment for the purpose of conducting unlawful pre-arraignment interrogations in violation of defendants' constitutional right to counsel.

122.    Evidence of the Queens District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendant's rights, including false or misleading argument to the jury and *Brady* violations, was uncovered during the civil rights litigation in *Su v. City of New York*, 06 Civ. 687 (EDNY) (RJD)(CLP), a case involving the wrongful conviction of a young man due to the knowing use of false evidence and argument and *Brady* violations. During that litigation, discovery of personnel records, together with deposition testimony, showed that in approximately 84 cases where courts had found prosecutorial misconduct, including the use of and failure to correct false or misleading testimony and *Brady* violations, the prosecutors were never disciplined, the Office had no formal or meaningful disciplinary policy,

procedure, training, or practice, and the Office trained prosecutors in a blatantly unlawful

"Chinese Wall" policy to prevent disclosure of impeachment evidence under *Brady*.  The

discovery obtained in that lawsuit is summarized in Joel B. Rudin, *The Supreme Court Assumes*

*Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That*

*Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011), a copy of which is

attached as Exhibit B and is incorporated herein by reference.  That case settled on or about

October 15, 2008, for $3.5 million.  *See* Corey Kilgannon, *City Will Pay $3.5 Million To a Man*

*Jailed 12 Years*, N.Y. Times, Oct. 17, 2008, at A21, *available at*

http://www.nytimes.com/2008/10/18/nyregion/18settle.html.  Notwithstanding that settlement,

the District Attorney's deliberately indifferent policies, customs or practices continued.

123.     The District Attorney's policy, custom and/or practice of approval or ratification

of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's

constitutional obligations foreseeably encouraged such violations to continue and was a

substantial cause of the violations of Plaintiff's constitutional rights before and during his trial,

his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and

prosecution.

124.     The aforesaid policies, procedures, regulations, practices and/or customs of

Defendant CITY were collectively and individually a substantial factor in bringing about the

aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and

in causing his damages.

125.     Under the principles of municipal liability for federal civil rights violations, the

District Attorney of Queens County (or his authorized delegates) has final managerial

responsibility for training, instructing, supervising and disciplining attorneys and other

employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial and trial proceedings.

126.    The Queens County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

127.    The District Attorney of Queens County, at all relevant times, was and is an elected officer of Queens County, one of the constituent counties of Defendant CITY; the Office was and is funded out of the CITY's budget; and the Office was and is a New York City agency.

128.    The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); New York has provided by statute (N.Y. County Law §§ 53, 941) that Defendant CITY's constituent counties (including Queens County), and hence Defendant CITY itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and THE CITY OF NEW YORK represents such officers and employees in judicial proceedings and indemnifies them because they are CITY officials.

129.    The District Attorney of Queens County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a CITY policymaker for whom the CITY is liable, with respect to the above-mentioned areas.

130.     During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

131.     By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.     For compensatory damages of not less than $7.5 million;

b.     For punitive damages of not less than $7.5 million;

c.     For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.     For pre-judgment interest as allowed by law; and

e.     For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN, P.C.


_____/s/_____
By:   JOEL B. RUDIN
        HARAN TAE
Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600

*Attorneys for the plaintiff*

Dated: New York, New York
         October 13, 2017