UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
RICARDO BENITEZ,

        Plaintiff,

        -against-

THE CITY OF NEW YORK, et al.

        Defendants.
----------------------------------------------------X

17 CV 3827 (SJ) (SJB)

MEMORANDUM
AND ORDER

A P P E A R A N C E S

LAW OFFICES OF JOEL B. RUDIN, P.C.
152 West 57th Street, 8th Floor
New York, NY 10019
By:    Joel B. Rudin
        Haran Tae
*Attorneys for Plaintiff*

NEW YORK CITY LAW DEPARTMENT
100 Church Street
New York, NY 10007
By:    Michael K. Gertzer
*Attorneys for Defendants*

JOHNSON, Senior District Judge:

Plaintiff Ricardo Benitez brings this action pursuant to 42 U.S.C. § 1983 against Defendants the City of New York ("the City"), as well as New York City Police Department ("NYPD") officers Raul Lopez and Frank Libretto, Sergeant Brian Stamm and Queens County District Attorney ("QDAO") employee Tina Grillo (collectively, the "Individual Defendants"). Presently before the Court is Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' motion to dismiss is DENIED in its entirety.

## BACKGROUND

The following factual summary is generated from Plaintiff's allegations in the Amended Complaint ("AC").

On June 24, 2009, a Radio Shack in Rockaway Park, Queens was robbed (the "Robbery"). Radio Shack employees Bernadette Johnson and Hazel Rodriguez, present at the time of the Robbery, described the suspect as a light-skinned African American or Hispanic male in his 20s or 30s. Johnson and Rodriguez further reported that the perpetrator was between 5'6" and 5'8", was wearing sunglasses, dark pants and had a goatee. Johnson and Rodriguez reported that the perpetrator had a gun and ran out of the store. Video surveillance showed the perpetrator moving around the store with no visible limp, wearing a sweatshirt with the hood pulled up and interacting with Johnson for no more than thirty

2

seconds. Johnson and Rodriguez viewed photographs of potential suspects at the precinct on June 24 and June 26, 2009, but made no identifications. NYPD officers searched the area for a man matching Johnson and Rodriguez's description on the day of the Robbery but returned no suspects.

On June 24, 2009, Plaintiff was 54 years old and lived across the street from the Radio Shack, but alleges that he was at a rehabilitation center, nearly ten miles away, on the day of the Robbery. In May 2009, Plaintiff was diagnosed with necrosis of the hip and was told that he needed surgery. Plaintiff ambulates with the help of a cane.

About a week later, Lopez was assigned to investigate the Robbery. Lopez knew that there were no suspects and was aware of both the surveillance video and the description provided by Johnson and Rodriguez. Lopez and Stamm conducted a database search to look for parolees in the relevant precinct, and found Plaintiff's (a parolee), name and address located close to the Radio Shack. On July 3, 2009, Lopez and Stamm brought Johnson in to view a photo array that included Plaintiff's photograph. Plaintiff alleges that Lopez and Stamm deliberately designed a photo array that, contrary to NYPD procedure, unlawfully suggested that Plaintiff was the perpetrator of the Robbery. Lopez and Stamm accomplished this by using a photo of Plaintiff in which he was the only man wearing a hooded sweatshirt and goatee, and was the only man unshaven, with short hair, looking gaunt and sickly. Johnson identified Plaintiff as the perpetrator in the photo array.

After Johnson's identification of Plaintiff, Lopez created a follow-up report known as a "DD5," which contained a summary of purported confidential tip received by Crime Stoppers. The tipster stated that he or she had personal knowledge of the Robbery and that a person named Rick committed it. The tipster reported that Rick lived on the sixth floor, to the left of an elevator bank of building "82-01" on an unnamed street. Plaintiff alleges that Lopez created this false DD5 to bolster a weak case.

On that same day, July 3, Lopez and Stamm went to Plaintiff's apartment to arrest him. Plaintiff was not there. Lopez interviewed Plaintiff's neighbor who said that he saw Plaintiff earlier that morning, walking with a cane. Lopez and Stamm saw Plaintiff walking with a cane later that day and arrested him. Nothing related to the Robbery was found at Plaintiff's apartment.

At the precinct, Lopez and Libretto, with Grillo supervising, placed Plaintiff in an allegedly suggestive lineup. Plaintiff alleges that the lineup was suggestive because he: was the only person whose photo had been in the array shown to Johnson; appeared 15-20 years older than the "fillers"; had darker skin (compared to the lighter-skinned fillers); was unclean and disheveled (in contrast the clean-cut policemen fillers); was noticeably thinner than the fillers and appeared sickly (whereas the fillers appeared in good health). Johnson identified Plaintiff from the lineup.

The QDAO subsequently drafted a complaint charging Plaintiff with robbery that Lopez executed under oath. The complaint was filed in court and formally initiated Plaintiff's criminal prosecution. Plaintiff alleges that this complaint was created based upon the improper identifications, and that the prosecutors that approved Plaintiff's prosecution were unaware of the discrepancy between the initial identifications of the perpetrator and the allegedly false identification evidence. Plaintiff was denied bail on arraignment.

On or about October 21, 2009, Lopez testified before the grand jury, and through alleged fraud, perjury, suppression of evidence and other misconduct, caused Plaintiff to be wrongfully charged with robbery. Plaintiff was convicted of all charges on October 19, 2010 and was sentenced to 22 years to life in prison. On August 20, 2014, Plaintiff's conviction was reversed on appeal. Plaintiff was acquitted on retrial and released from custody on March 11, 2015. Plaintiff spent five years, eight months and eight days in custody.

## DISCUSSION
### A. Legal Standard

When considering a 12(b)(6) motion to dismiss, the Court must determine whether or not a claim is legally sufficient. See Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). In order for a claim to stand, a plaintiff must allege sufficient factual matter to state a claim that can plausibly give rise to entitlement to relief. See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements" are not legally sufficient to withstand a 12(b)(6) motion. Ashcroft v. Iqbal, 556 U.S. 662, 678. Instead, a plaintiff must offer "enough facts to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). However, the plaintiff need not set forth a multitude of facts to survive a motion to dismiss; rather, a "short and plain statement of the claim showing that the pleader is entitled to relief" will suffice. Fed. R. Civ. P. 8(a)(2). The Court must accept all of the allegations in the complaint as true, and construe all reasonable inferences in favor of the plaintiff. See Reed v. Garden City Union Free Sch. Dist., 987 F. Supp. 2d 260, 265 (E.D.N.Y. 2013).

In considering a motion to dismiss, a court may consider the pleading itself, documents referenced in the complaint, documents that the plaintiff relied on in bringing the suit and matters of which judicial notice may be taken. See Arrocha v. City Univ. of N.Y., 878 F. Supp. 2d 364, 368 (E.D.N.Y. 2012). Courts routinely take judicial notice of transcripts at the motion to dismiss stage—including those of testimony provided in related criminal proceedings—when they are incorporated into the complaint by reference. See, e.g., S.E.C. v. Siebel Sys., Inc., 384 F. Supp. 2d 694, 699 n.6 (S.D.N.Y. 2005) (taking judicial notice of transcripts relied upon by the complaint). The Court therefore considers the exhibits appended by Defendants to their moving papers, consisting primarily of trial transcripts and police reports. However, the Court will not entertain Defendants' factual

challenges at this juncture because a substantial portion of Plaintiff's allegations is that the Individual Defendants fabricated the evidence that was relied upon in those transcripts and police reports in a manner that violated his constitutional right to a fair trial and to be free from malicious prosecution. Discovery is necessary to determine whether Plaintiff can prove those allegations. Accordingly, the Court accepts Plaintiff's allegations as true for the purposes of deciding the instant motion to dismiss.

### B. Plaintiff's Claims Against the Individual Defendants

#### 1. Plaintiff's Fair Trial Claim

Plaintiff argues that the Individual Defendants violated his right to a fair trial by manufacturing false evidence that was then used to initiate his prosecution. This claim withstands a motion to dismiss.

A person suffers a constitutional violation of his right to fair trial if "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. §

1983." Garnett v. Undercover Officer C0039, 838 F.3d 265, 275 (2d Cir. 2016) (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)).

Defendants move to dismiss Plaintiff's fair trial claim on the basis that Plaintiff did not, and cannot plead that any of the fabricated evidence caused him to suffer harm, as none of the evidence was admitted at trial. This argument mischaracterizes Plaintiff's claim and is unpersuasive. The crux of Plaintiff's fair trial claim is that the Individual Defendants denied him his right to a fair trial by manufacturing false evidence that was used to initiate the prosecution that resulted in his conviction and imprisonment. In the Amended Complaint, Plaintiff alleges that the Individual Defendants manufactured false identification evidence, as well as a false DD5 tip sheet that recorded a fake anonymous call that identified Plaintiff as the perpetrator of the Robbery. (See AC ¶¶ 34–43, 54–60.) Plaintiff also alleges that the Individual Defendants gave this fabricated evidence to prosecutors, who then used this fabricated evidence to prosecute Plaintiff and secure a conviction. (Id. ¶¶ 61–76.)

While it is true that in order to withstand a motion to dismiss Plaintiff must plead that the Individual Defendants' wrongful acts proximately caused his injuries, Plaintiff has done so by pleading facts sufficient to support the inference that the Individual Defendants fabricated evidence that was likely to influence a jury's decision. See Lopez v. City of New York, 105 F. Supp. 3d 242, 247 (E.D.N.Y. 2015); see also Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not

readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an independent decision that results in a deprivation of liberty.") (quotation marks omitted). Defendants argue that the prosecution's decision to go forward with the case against Plaintiff based upon Johnson's testimony was a superseding cause that defeats causation. (See Defs.' Reply Mem. at 3–6.) But not only is this affirmative defense premature at this juncture, it is insufficient to sever the causal chain because Johnson's testimony does not prove or disprove that the fabricated evidence caused Johnson to be certain that she had correctly identified Plaintiff as the perpetrator of the crime. Accordingly, dismissal of Plaintiff's fair trial claim is denied.

### 2. Plaintiff's Malicious Prosecution Claim

Section 1983 claims for malicious prosecution draw its elements from the relevant state law. Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id. at 161 (citation and quotation marks omitted). In their motion to dismiss, Defendants contend that Plaintiff has failed to plead the requisite lack of probable cause and initiation of proceedings elements of

a malicious prosecution claim. The Court addresses these elements in turn and concludes that Plaintiff's claim withstands a motion to dismiss.

### a. Probable Cause

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). "[I]ndictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Savino, 331 F.3d at 72 (citing Colon v. City of New York, 468 N.Y.S.2d 453, 456 (1983)). A plaintiff can overcome this presumption of probable cause by a showing of "[e]vidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney[.]" Colon, 468 N.Y.S.2d at 455–56; see also Manganiello, 612 F.3d at 162 (noting that the presumption of probable cause may be overcome if "there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment") (quotation marks and citation omitted).

Here, Plaintiff alleges that all of the evidence used to secure his indictment was fabricated. These allegations, taken as true, sufficiently rebut the presumption of probable cause created by a grand jury indictment. See Ying Li v. City of New York, 246 F. Supp. 3d 578, 612–13 (E.D.N.Y. 2017) (collecting cases) (finding that

the plaintiff sufficiently rebutted the presumption of probable cause in connection to a motion to dismiss by alleging that defendants falsified and fabricated evidence).

### b. Initiation of Proceedings

In the context of a malicious prosecution action, "a defendant could have initiated a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." Ying Li, 246 F. Supp. 3d at 605 (quotation marks and citation omitted). A police officer can also initiate a prosecution by filing a criminal complaint or other accusatory instruments. See Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010).

Plaintiff has adequately alleged that Defendants initiated the prosecution against him, as the Amended Complaint alleges that the Individual Defendants manufactured the photo array and anonymous tip. Plaintiff also alleges that Defendant Lopez signed the Criminal Court complaint. (See AC ¶¶ 34–43, 54–76.) Defendants "cannot hide behind the decision of the DA to prosecute" when the Individual Defendants allegedly provided the fabricated evidence to prosecutors that became the basis of the prosecution against Plaintiff. See Ying Li, 246 F. Supp. 3d at 606 (quoting Blake v. Race, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007).

As with Plaintiff's fair trial claim, dismissing Plaintiff's malicious prosecution claim at this juncture is premature, and discovery should be allowed to proceed.[1]

### 3. Qualified Immunity

The doctrine of qualified immunity is a defense that "shields public officials performing discretionary functions from [section 1983] liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." Bradway v. Gonzales, 26 F.3d 313, 317–18 (2d Cir. 1994) (citation and quotation marks omitted).

A public official is not entitled to qualified immunity "when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Terebesi v. Torreso, 764 F.3d 217, 230 (2d Cir. 2014) (citation and quotation marks omitted).

As Plaintiff has adequately alleged that the Individual Defendants fabricated evidence in violation of his constitutional rights, they are not entitled to qualified immunity at this juncture. See Ying Li, 246 F. Supp. 3d at 641; Bailey v. City of

---

[1] Defendants' motion to dismiss the action as to Defendant Stamm is similarly denied, as Plaintiff alleges that Stamm helped to create the suggestive photo array that became a basis for Plaintiff's prosecution and conviction. (See AC ¶¶ 34–43.)

New York, 79 F. Supp. 3d 424, 458 (E.D.N.Y. 2015) ("No defendant officer is entitled to qualified immunity when alleged fabrication of evidence is key to the case.").

### C. Plaintiff's Monell Claim against the City of New York

Plaintiff alleges that the Queens County prosecutors violated his constitutional rights by coaching Johnson to change her identification of the perpetrator to one that matched Plaintiff; failing to correct false hearing testimony; withholding exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); and by making false statements in summation regarding the fabricated evidence. (See AC ¶¶ 92–112.) Plaintiff further alleges that these constitutional violations occurred because of the City of New York's unlawful policies, customs or practices. (Id. ¶¶ 114–24.) The Court finds that Plaintiff's allegations regarding the City of New York are sufficient to withstand a motion to dismiss.

Defendants argue that Van de Kamp v. Goldstein, 555 U.S. 335 (2009), precludes a Monell claim premised upon a DA's failure to train, supervise or discipline its prosecutors on their fair trial obligations, because it classifies supervision and training regarding fair trial compliance as prosecutorial, rather than administrative. In so doing, Defendants improperly extend the principles that govern individual liability to those that govern municipal liability. Under Van de Kamp, prosecutors "enjoy[] absolute immunity even when doing an administrative act if the act is done in the performance of an advocacy function." Warney v.

13

Monroe County, 587 F.3d 113, 124 (2d Cir. 2009) (citing Van de Kamp, 555 U.S. at 342). But in determining whether a municipality is liable under section 1983, a court "ask[s] whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue, an inquiry that will necessarily be dependent on the definition of the official's functions under relevant state law." Myers v. County of Orange, 157 F.3d 66, 76 (2d Cir. 1998) (quoting McMillian v. Monroe County, 520 U.S. 781, 785 (1997)) (quotation marks omitted). Thus, the relevant inquiry in determining whether a municipality is subject to section 1983 liability is not whether the DA is acting in an administrative or prosecutorial role as is required in determining whether absolute immunity attaches, but whether the DA is functioning as a local or state actor under state law.

Under New York law, DAs are presumed to be local officers, barring a "narrow exception" of when they make determinations as to whether to prosecute an individual case. Myers, 157 F.3d at 76–77; see also Gentile v. County of Suffolk, 926 F.2d 142, 152 n.5 (2d Cir. 1991) (nothing that while a county cannot be liable for the ADA's improper filing of an indictment, liability can be based on its "long history of negligent disciplinary practices regarding law enforcement personnel, which [gives] rise to . . . conduct . . . promoting malicious prosecution of plaintiffs"). Courts in this circuit have recognized that a county can be liable under section 1983 for the DA's management of the office, including "decision[s] not to supervise or train ADAs on Brady and perjury issues," and other managerial

decisions that result in the implementation of unconstitutional policies.  Myers, 157 F.3d at 77 (citing Walker, 974 F.2d at 301); see also Poux v. County of Suffolk, 2010 WL 1849279, at *6 (E.D.N.Y. May 4, 2010) (citing cases).  This interpretation is borne out by New York State courts.  See, e.g., Ramos v. City of New York, 285 A.D.2d 284, 303 (1st Dep't 2001); Johnson v. Kings Cnty. Dist. Attorney's Office, 308 A.D.2d 278, 295–96 (2d Dep't 2003).

In this case, the conduct alleged by Plaintiff falls squarely within the bounds of a DA's role as a local actor, and the City of New York can therefore be subject to section 1983 liability on this basis.  The Court next addresses whether Plaintiff has sufficiently pleaded a Monell claim.

"For a Monell claim to survive a motion to dismiss, a plaintiff must allege sufficient factual detail and not mere boilerplate allegations that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy."  Ying Li, 246 F. Supp. 3d at 636 (citation and quotation omitted).  Plaintiff must specifically plead: "(1) an official custom or policy that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  McCrary v. County of Nassau, 493 F.Supp.2d 581, 588 (E.D.N.Y. 2007) (citing Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)).

A plaintiff can satisfy the policy requirement by alleging either "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused

15

the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Here, Plaintiff's Monell claim is premised upon allegations that the QDAO was deliberately indifferent to the need to train, supervise, or discipline its prosecutors in their constitutional obligations to disclose exculpatory evidence, and otherwise ensure that criminal defendants have a fair trial. Plaintiff also alleges that this deliberate indifference resulted in prosecutors violating Plaintiff's constitutional right to a fair trial. In support, Plaintiff cites a litany of cases where courts have found that Queens County prosecutors violated the fair trial rights of criminal defendants by withholding Brady and other material. (See AC ¶¶ 89–131.) These allegations are sufficient to support an inference that the alleged policy and practice exists. See Ogunkoya v. County of Monroe, 2017 WL 6419146, at *14 (E.D.N.Y. June 2, 2017) (collecting cases). Because the Court finds that Plaintiff has plausibly pleaded underlying constitutional violations and a pattern and practice that resulted in those violations, dismissal of the Monell claim prior to

discovery is inappropriate, and Defendants' motion to dismiss the Monell claim is denied.

## **CONCLUSION**

For the aforementioned reasons, Defendants' motion to dismiss is DENIED. Any of Defendants' remaining arguments have been considered and are without merit. The Court respectfully refers issues relating to discovery to Magistrate Judge Bulsara.

SO ORDERED.

Dated: June 13, 2018  /s/
      Brooklyn, New York  Sterling Johnson, Jr., U.S.D.J.